UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------X

UNITED STATES OF AMERICA, **15 CR 616-KBF**

- v. -

FRASER THOMPSON,

Defendant.

---------------------------------------------------X

**SENTENCING MEMORANDUM OF FRASER THOMPSON**

BROWNE GEORGE ROSS LLP
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone: (310) 274-7400
*Attorneys for Fraser Thompson*

Mr. Thompson submits this memorandum and letters in support of his request that this Court impose a non-Guidelines sentence in this case under *United States v. Booker*, 543 U.S. 220 (2005) and 18 U.S.C. § 3553(a), rather than any sentence resulting from the calculations of the offense level under the advisory Federal Sentencing Guidelines. Mr. Thompson submits that an analysis of the relevant sentencing factors in this case, pursuant to § 3553(a), demonstrates that a sentence under the Guidelines, as calculated by probation and the government, is significantly greater than necessary to accomplish the goals of sentencing. Mr. Thompson agrees with the conclusion of the probation office in the Presentence Investigation Report ("PSR") that a variance from the advisory Guidelines is appropriate in this case pursuant to the sentencing factors set forth in section 3553(a). (*See* PSR, pp.33.) But though the PSR recommendation is far more reasonable than the sentence that the government seeks, Mr. Thompson requests that this Court impose a sentence of incarceration not to exceed 36 months.

## I. INTRODUCTION

Following a mistrial, Mr. Thompson was convicted on four counts: Count 6 - conspiracy to commit wire fraud (18 U.S.C. § 1349); Count 7 - wire fraud (18 U.S.C. §§ 1343 and 2); Count 8 - aggravated identity theft (18 U.S.C. §§ 1028A and 2); and Count 9 – money laundering (18 U.S.C. § 1956(h)). The PSR calculates an offense level of 35, which results in a Guidelines range of 168-210 months. By contrast, Mr. Thompson has calculated an offense level of 33 under the advisory Guidelines, which carries a range of 135-168 imprisonment.

Significantly, in spite of its Guidelines calculation, the probation office has recognized that the advisory Guidelines sentence is not appropriate in this case when considering the history and characteristics of Mr. Thompson and the nature and circumstances of the offense. (*See* PSR, 33.) Rather, the PSR recommends a downward variance from the advisory Guidelines sentence in this case, pursuant to section 3553(a). (*Id.*) Consequently, the probation department suggests a sentence of 120-144 months' imprisonment. (*Id.*) Mr. Thompson agrees with the probation

department that a non-Guidelines sentence[1] is warranted in this case, but believes that a sentence of 36 months or less is sufficient but not greater than necessary to serve the sentencing purposes of § 3553(a).

## II. RELEVANT LEGAL PRINCIPLES

After the United States Supreme Court decision in *United States v. Booker*, 543 U.S. 220 (2005), the Federal Sentencing Guidelines are no longer mandatory. *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005), abrogated in part on other grounds, *United States v. Fagans*, 406 F.3d 138 (2d Cir. 2005). District courts once again have broad discretion to take the factors set forth in 18 U.S.C. § 3553(a) into account at sentencing:

> [I]n determining the appropriate sentence, the court should consider a number of factors, including "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the sentencing range established" by the Guidelines, "any pertinent policy statement" issued by the Sentencing Commission pursuant to its statutory authority, and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *Ibid.* In sum, while the statute still requires a court to give respectful consideration to the Guidelines, .., Booker "permits the court to tailor the sentence in light of other statutory concerns as well."

*Kimbrough v. United States*, 552 U.S. 85, 128 S. Ct. 558, 570 (2007) (internal citations omitted); *see also Gall v United States*, 552 U.S. 38, 128 S. Ct. 586 (2007).

Further, "[section 3553(a)], as modified by *Booker*, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing, including 'to reflect the seriousness of the offense,' 'to promote respect for the law,' 'to provide just punishment for the offense,' 'to afford adequate

[1] The Second Circuit has indicated its preference to "refer to a sentence that is neither within the applicable Guidelines range nor imposed pursuant to the departure authority in the Commission's policy statements as a 'non-Guidelines sentence' in order to distinguish it from the term 'departure.'" Crosby, 397 F.3d at 112, n.9; *see also United States v. Keller*, 539 F.3d 97, 99 n.2 (2d Cir. 2008). A "departure" sentence is a decision to sentence outside the applicable sentencing range based upon a departure provision of the Guidelines and is, therefore, still a Guidelines sentence. *Id.* By contrast, a "non-Guidelines" sentence results from a district court's post-*Booker* power to impose a sentence outside the applicable Guidelines range pursuant to § 3553(a) considerations. *Id*.

deterrence to criminal conduct,' and 'to protect the public from further crimes of the defendant.'" *Kimbrough*, 128 S. Ct. at 570 (emphasis added); 18 U.S.C. § 3553(a). District courts are now allowed to vary from Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines. *Id*.; *cf. Rita v. United States*, 551 U.S. 338, 127 S. Ct. 2456, 2465 (2007) (a district court may consider arguments that "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations").

In *Crosby*, *supra*, the Second Circuit held that, in determining an appropriate sentence in the post-*Booker* regime, a sentencing court should consider the Guidelines and all of the factors listed in section 3553(a). After considering the Guidelines and 3553(a) factors, the court can then decide "whether (i) to impose the sentence that would have been imposed under the Guidelines, i.e. a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence." *Crosby*, 397 F.3d at 113. In so doing, "the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence." *Id*.

The Second Circuit has held that "consideration of the Guidelines will normally require determination of the applicable Guidelines range, or at least identification of applicable policy statements." *Crosby*, 397 F.3d at 113 (emphasis added). However, the Court has also stated that it "will not prescribe any formulation a sentencing judge will be obliged to follow in order to demonstrate discharge of the duty to 'consider' the Guidelines." *Id*.

Indeed, the Court specifically held that, in some instances, "precise calculation of the applicable Guidelines range may not be necessary." *Id*. at 112. As *Crosby* explains:

> Now that the duty to apply the applicable Guidelines range is not mandatory, situations may arise where either of two Guidelines ranges, whether or not adjacent, is applicable, but the sentencing judge, having complied with section 3553(a), makes a decision to impose a non-Guidelines sentence, regardless of which of the two ranges applies. This leeway should be useful to sentencing judges in some cases to avoid the need to resolve all of the factual issues necessary to make precise determinations of some complicated matters, for example, determination of monetary loss. Similarly, close questions may sometimes arise as to the precise meaning or application of a policy statement authorizing a departure, and a judge who has considered policy statements concerning departures need not definitively resolve such questions if the judge has fairly decided to impose a non-Guidelines

sentence.

*Crosby*, 397 F.3d at 112. The Court also "recognize[d] that additional situations may arise where the sentencing judge would not need to resolve every factual issue and calculate the precise Guidelines range, because the resolution of those issues might not affect a non-Guidelines sentence if the sentencing judge chooses to impose it." *Crosby*, 397 F.3d at 112, n. 21.

The Second Circuit reaffirmed these principles and held that in certain complex or ambiguous sentencing situations, a district court is not bound to "choose one Guidelines range in particular, and is free to take the more flexible – and often, more direct – approach of arriving at a more appropriate sentence outside the Guidelines. In light of *Booker*, the judge could simply look at all of the facts, take [the parties'] suggestions into account, consider the § 3553(a) factors, and come up with a 'hybrid' approach if [s]he so chose." *United States v. Dhafir*, 577 F.3d 411, 415 (2d Cir. 2009).

"In short, while a sentencing court is statutorily obligated to give fair consideration to the Guidelines before imposing sentence ... in the end, it must make an 'individualized assessment' of the sentence warranted by § 3553(a) 'based on the facts presented.'" *United States v. Jones*, 531 F.3d 163, 170 (2d Cir. 2008) (internal citations omitted). "The Supreme Court has clearly signaled that district courts enjoy considerable discretion in identifying the grounds that can justify a non-Guidelines sentence." *Id.* at 172.

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 131 S. Ct. 1229, 1239-40 (2011) (citation omitted). This tradition is based on the principle that the punishment must fit the offender, not just the crime. *Id.* at 1240.

Under the circumstances of this case, a sentence under the advisory Guidelines – based upon the offense levels calculated by probation or the government – would "be greater than necessary" to accomplish the goals of sentencing. Rather, a number of factors relevant to the

sentencing determination under section 3553(a) combine to justify a non-Guidelines sentence in this case that fit Mr. Thompson specifically, not just the crime.

## III. Section 3553(A)(1)—The History and Characteristics of Fraser Thompson

Pursuant to 18 U.S.C. § 3553(a), this Court's decision as to the appropriate sentence must include consideration of Mr. Thompson's history and characteristics. Although this Court and Mr. Thompson spent a number of weeks together during his trials, there has been no opportunity for the Court to become familiar with Mr. Thompson as a person. Fraser Thompson, the individual, is of much greater substance, and markedly different character, than revealed in the limited glimpse of Fraser Thompson, the defendant, that the Court obtained during these legal proceedings. Kindness, integrity, loyalty, and numerous selfless acts on his part are reflected throughout the letters that have been submitted to this Court on his behalf. Mr. Thompson's life history reveals an individual motivated by intellectual strength and curiosity, coupled with a strong sense of compassion, who has a genuine desire to help individuals in need.

Mr. Thompson is 36 years old. He is the only child to his parents Robert and Karen Thompson, aged 69 and 67, respectively. They live in Palm Springs, California. Mr. Thompson has lived in the United States since the age of 13 and became a naturalized citizen in 2014.

Mr. Thompson met his wife, Kyla, while they were attending college at Huron University in Ontario, where Mr. Thompson switched his major from Business to Philosophy. Together they have two children, a daughter, Parker, age five, and a son, Bodhi, just shy of one. They have no immediate family in the area to assist with childrearing.

Mr. Thompson was employed in the mobile telephone industry from 2007 to 2013. (PSR, ¶¶121-125) He was employed at the mobile aggregator Mobile Messenger from 2008 to 2013. (PSR, ¶ 121-122) In late 2013 he began working full-time in a retail juice and smoothie business he founded and partly owns. (PSR, ¶¶119-120)

Mr. Thompson has a history of childhood asthma, as well as anxiety, including anxiety related to the Federal Trade Commission case preceding this prosecution and by this criminal case. (PSR, ¶¶108-111) In 2011, he was hospitalized to treat his anxiety and, recently, has been

prescribed Xanax for anxiety related to the current litigation. (*Ibid*.)

All the available character evidence regarding Mr. Thompson conveys that he is a kind and altruistic man, a supportive husband, and attentive father, who made a terrible mistake by agreeing to participate (for at most a year and a half) in a criminal scheme masterminded and controlled by others. That choice was an aberration not consistent with his character, which has been otherwise outstanding. It is also one that he will be paying for the rest of his life.[2]

Mr. Thompson's family and friends have provided numerous letters in his support.

Mr. Thompson's wife, Kyla Schaefer, writes that they met in college, in an environmental ethics class, and that Mr. Thompson impressed her with his intellectual curiosity, hardworking character, and drive. (Exhibit B) She writes that in their marriage they are equals, with Mr. Thompson spending "countless hours" supporting her career goals, whether crafting resumes and job applications, or helping sand, glue, and paint projects for her architecture program. Kyla writes that giving back is always on his mind; shortly after their daughter was born, Mr. Thompson built a fresh water well, bearing their daughter Parker's name, serving several villages in Africa. He uses the story to teach Parker her responsibility to give back what life has provided them. Of all he has done to help others, she writes that his greatest service and most cherished accomplishment is creating a nurturing environment for his children, raising them to be good people. She writes that when she pursued her dream to become an architect and went back to school, he became their primary caregiver. Her parents also note the same, that Mr. Thompson took on much of the primary caregiving for the children, and that his support for his wife has been "unwavering." (Letter of Karen and Warner Schaefer, Exhibit C) As to their current predicament, Mr. Thompson is "sick with remorse" that their loving family may be broken up as a result of his actions.

Mr. Thompson is a "hands on" father who volunteered at every event at his daughter's school, always seeking out ways to help and going "above and beyond" what was asked of him.

[2] At the Court's direction, Mr. Thompson has written a letter describing his background and future plans that is attached hereto as Exhibit A.

(Letters of Laura Gallagher and Crestwood Hills School Director Joanna Port, Exhibits D and E) He lavished “boundless,” “patient,” and “kind” attention on his children; his in-laws write that, at home, Mr. Thompson’s place is on the floor, playing with his children or reading them books.

Friends also write that Mr. Thompson is a warm and giving man who can be counted on for unconditional support. His college friend Faisal Premji writes how Mr. Thompson ignored a severe stutter to befriend and support him, coaxing him out of his shell, introducing him to friends, and taking him to parties; when others mocked Mr. Premji’s stutter or awkwardness, Mr. Thompson defended him. He attributes his confidence and success in life to Mr. Thompson’s friendship and support. (Exh. F) Another college friend, Ryan Power, writes how after Power’s younger brother was diagnosed with schizophrenia, Mr. Thompson made an eight-hour drive to their home to keep the family company. Mr. Thompson connected with Power’s brother personally and supported his art, collecting and prominently hanging several of his paintings in his home. (Exh. G) Friends with Mr. Thompson since they were teenagers, Theodore Stern recounts how, when his parents divorced when he and Mr. Thompson were 17, Mr. Thompson walked away from a summer job in Cape Cod to spend his summer with a friend in need. (Nurik Decl. Exh. H)

According to his longtime friend and business partner, Mr. Thompson is no different as a businessperson. (Letter of Jack Latner, Exh. I) He heads a happy and dedicated team as the chief of human resources in a wellness lifestyle business, Lifehouse Tonics + Elixirs.[3] There he spearheads the company’s charitable donations, donating proceeds of drink sales to environmental causes and charities, including No Kid Hungry. His business partner writes that Mr. Thompson puts others first in all situations, even when it temporarily compromises the company’s bottom line. And he does all this after waking early each morning to prepare breakfast for his children.

[3] A screenshot of the Yelp review of this location is attached hereto as Exhibit T. While not yet profitable, the business is currently growing, with a second location opened, and boasts a 5-star rating.

Mr. Thompson's parents added an additional note to counter what they heard at trial—about a lifestyle of Bentleys and Ferraris and Las Vegas. Whatever might have been the case for others, that was not the case for their son. He still drives the same car that he bought when he moved to California, while his wife Kyla drives a used SUV. (Exh. J) His financial priorities have been repaying their student loans, funding school for his wife and children, and making a home for his family in a district with good schools.

The convictions in this case, moreover, are a marked departure from an otherwise exemplary and law-abiding life. Regardless of whether the offense conduct might technically meet the requirements for an "aberrant behavior" downward departure under the Guidelines, this conviction clearly constitutes aberrant behavior in the life of Mr. Thompson for purposes of assessing a proper non-Guidelines sentence. *See, e.g.*, *United States v. Toback*, 2005 WL 992004, *5 n.1 (S.D.N.Y. 2005) (Sweet, J.) ("The Court is not departing downward under the aberrant behavior rationale. Instead, the Court is imposing a non-Guideline sentence, relying, in part, on the aberration of the instant offense in defendant's typically law-abiding life.").

Mr. Thompson's lifetime of law-abiding behavior, good deeds, contributions to society, and upstanding character – both before and after the offenses in this case – are not extinguished by the jury's verdicts. Rather, consideration of those factors is imperative in arriving at an individualized determination of a sentence that is "sufficient, but not greater than necessary" to accomplish the goals of sentencing. "[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *Adelson*, 441 F. Supp. 2d at 513-514. Mr. Thompson's life history and personal characteristics demonstrate that a non-Guidelines sentence is appropriate in this case.

## IV. The Nature and Circumstances of the Offense.

Mr. Thompson does not dispute the seriousness of the offense for which he was convicted, but requests that this Court take into account his limited role in the scheme.
The PSR correctly notes that Mr. Thompson was not one of the originators of the scheme and he

did not participate in the negotiation of how to split the proceeds from the arrangement. (PSR at ¶ 33, ¶ 49.) The evidence at both trials was uncontroverted that Mr. Thompson was not part of the Tattoo or Assifuah schemes and was not initially considered by the other coconspirators (Eromo, Paj and Wedd) to be included in the Zhenya auto-subscribing scheme. As numerous documents at the trials revealed, Mr. Thompson did not play any significant role in furthering the scheme. Paj testified that Thompson was not needed to further the scheme. Several emails admitted into evidence revealed that the instructions to Thompson's staff and others regarding implementing the mechanics of the scheme came from Mr. Eromo, not Mr. Thompson. The picture that the jury had before it, which it obviously relied upon in reaching its guilty verdict, was one of a person whose intent was based on conscious avoidance. In its remarks after the verdict, this Court noted that "if I were to rank people in terms of their levels of culpability, he (Thompson) would be at the very bottom of all of these defendants, including Mr. Jason Lee, and including Mr. Goff, and far below Mr. Wedd." Tr. 9/5/17 at 2929, ll. 4-7 (Exh. U)

As to the monetary consequences of Mr. Thompson's conduct, he further submits that the numbers asserted by the Government create an incorrect impression of the degree of his culpability. The Government contends that Mr. Thompson is responsible for a total loss of over $51,281,846.26. (PSR, ¶ 70.) That amount consists of $41,389,725.60 of auto-subscribing charges related to Australia content providers CF Enterprises and DigiMobi, along with $9,892,120.65 in proceeds received by Mr. Thompson's company Ocean Tactics. (PSR, ¶ 70.) Independent of whether that figure is the proper one for loss attribution under the Guidelines (a point discussed below), it certainly overstates the proven illegality and involvement of Mr. Thompson.

First, there has been no showing that all of those funds arose from the activities giving rise to the conviction. At its height, Mr. Thompson's employer, Mobile Messenger, was a thriving business with 200 employees. This Court cannot not assume that all of those proceeds arose from illegal auto-subscribing. Just because a defendant is convicted of selling drugs, a court may not assume that all the money he has is drug money, just as a court cannot assume that

every check a defendant cashed was fraudulent just because he was convicted of cashing forged checks. *U.S. v. Archer*, 671 F.3d 149, 164 (2d Cir. 2011). So too, just because Mr. Thompson was convicted of involvement in an illegal auto-subscribing scheme, this Court may not assume at his sentencing that all of the proceeds involving Ocean Tactics or the content providers in question resulted from illegal activity. "When the Guidelines allow for punishment of relevant conduct as through it were convicted conduct, we have a special obligation to ensure that the evidence of relevant conduct is solid." *Id.* at 165.

Second, accepting the PSR and the Government's contention that Mr. Thompson received, through Ocean Tactics, another $9,892,120 for a "separate content provider scheme" that was illegal (PSR, ¶ 70), it is undisputed that this amount derived from a content provider operation for which Mr. Thompson was never charged. It is worth noting on this point that Mr. Thompson reported $8,892,121 in gross receipts, and paid taxes on that amount, for Ocean Tactics for 2012 and 2013. (PSR, ¶ 123.)

Third, Mr. Thompson is found to have received only a fraction of the $41 million related to the Australian content providers, which was intermixed with the other content provider money and not specifically identified (as was done for Paj). According to the PSR, revenue generated by premium SMS subscriptions were split as follows: 40-50% was collected by mobile phone carriers, 20-35% by content providers, and 25-30% by aggregators. (PSR, ¶ 26.) For the arrangement involving CF Enterprises and DigiMobi, it was Wedd, Eromo, and Tsvetenenko who negotiated the revenue split. (PSR, ¶ 49.) Tsvetnenko received 70% of the proceeds, with the remaining 30% split fairly equally between Wedd, Thompson, Eromo, and Pajaczkowski. (PSR, ¶¶ 49, 53.) Therefore, of the $41 million in charges relating to CF Enterprises and DigiMobi, 40-50% was retained by the mobile phone carriers; of the remainder, Tsvetenenko kept 70%, and, according to an agreement that Mr. Thompson did not negotiate, he and three others split the remainder in approximately equal fourths. Of the $41+ million, Mr. Thompson likely only received, at most, approximately $1,862,537 ($41,389,725 minus 40% minus 70% divided by 4).

Mr. Thompson's role in the actual criminal conspiracy was comparatively minor. Whether or not his role qualifies for a mitigating role adjustment pursuant to USSG § 3B1.2, this Court can consider his role as a relevant factor in determining whether a non-Guidelines sentence is appropriate.[4] In addition, the fact that Mr. Thompson possessed a diminished intent relative to his co-conspirators is likewise a relevant consideration in determining whether a non-Guidelines sentence is warranted, and the nature of that sentence.[5]

Whether considered individually as independently mitigating circumstances, or as a constellation of factors that remove this case and Mr. Thompson from the "heartland" of conspiracy cases and defendants to which the Guidelines apply, the foregoing factors justify a non-Guidelines sentence in this case.[6] Mr. Thompson's actions, role, and intent relative to the

---

[4] Indeed, even under the mandatory Guidelines scheme, this Court noted that there was some potential overlap between the analysis of the mitigating role adjustment and the "outside the heartland" departure. *See United States v. Nachamie*, 121 F. Supp. 2d 285, 297 n.11 (S.D.N.Y. 2000). This Court held that its denial of a mitigating role adjustment did not prevent a separate finding that the defendant's intent and role in the offense was such as to bring the case "outside the heartland" and warrant a downward departure. *Id.* (*citing United States v. Bruder*, 103 F. Supp. 2d 155, 180 (E.D.N.Y. 2000) ("A downward departure may sometimes be warranted in addition to or instead of a mitigating role adjustment.") *vacated in part on other grounds*, *United States v. Schwarz,* 283 F.3d 76 (2d Cir. 2002)). Similarly, under the present sentencing regime – where this Court need not even resolve close questions regarding Guidelines applications – this Court can certainly consider Mr. Thompson's role in the offense in assessing a non-Guidelines sentence, regardless of whether that role qualifies for an adjustment under USSG § 3B1.2.

[5] Again, even under the mandatory Guidelines scheme, the fact that a defendant's intent was diminished relative to his co-conspirators, or was different than that of a typical defendant for the particular type of offense involved, could warrant a downward departure. *See e.g. Nachamie, supra*; *United States v. Broderson*, 67 F.3d 452, 459 (2d Cir. 1995).

[6] Even pre-*Booker*, courts recognized that sometimes no particular mitigating factor would individually justify a downward departure, but the combination of such factors could warrant a departure from the Guidelines range. *See e.g*. *United States v. Rioux,* 97 F.3d 648, 663 (2d Cir. 1996) ("In extraordinary cases, however, the district court may downwardly depart when a number of factors that, when considered individually, would not permit a downward departure, combine to create a situation that differs significantly from the heartland cases covered by the guidelines.") (internal citations and quotation marks omitted). But the Court "may not presume that the Guidelines range is reasonable." *United States v. Carty*, 520 F.3d 984, 994 (9th Cir. 2008) (citing *Gall v. United States*, 552 U.S. 38, 50 (2007), and *Rita v. United States*, 551 U.S.

offenses of conviction demonstrate that he is of lesser culpability than his co-conspirators or a typical conspiracy defendant.

**V. Sections 3553(A)(3)-(A)(5)—Consideration of the Guidelines[7]**

While this Court is directed to "consider" the Guidelines and any applicable policy statements in assessing an appropriate sentence under § 3553(a), the Second Circuit has refused to "prescribe any formulation a sentencing judge will be obliged to follow in order to demonstrate discharge of the duty to 'consider' the Guidelines." *Crosby*, 397 F.3d at 113. The Court in *Crosby* further held that in certain situations where a sentencing judge decides to impose a non-Guidelines sentence, a precise Guidelines calculation may not be necessary and that such "leeway should be useful in some cases to avoid the need to make precise determinations of some complicated matters, for example, determination of monetary loss." *Id.* at 112 (emphasis added).

Although there are a number of specific differences in the parties' Guidelines calculations regarding the offense level in this case, the most significant difference revolves around the calculus of the amount of loss. The government has argued for, and probation has apparently accepted, loss in an amount in excess of $25 million in this case, which results in a 22-level increase in offense level, using the post-2016 monetary loss/gain table. (USSG § 2B1.1) Mr. Thompson has argued that the loss cannot be determined with reasonable certainty and, consequently, there should be no resulting increase in offense level.

---

338, 351 (2007)). "Nor should the Guidelines factor be given more or less weight than any other. While the Guidelines are to be respectfully considered, they are one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence." *Id.* at 991; *see also Kimbrough*, 552 U.S. at 90; *Gall*, 552 U.S. at 48-50, 59. Mr. Thompson believes that a number of factors in his case, individually, justify a non-Guidelines sentence and certainly, in combination, a non-Guidelines sentence is warranted.

[7] The various Guidelines calculations and related disputes and objections are set forth more fully in the Presentence Investigation Report; however, Mr. Thompson thinks it is appropriate to address in this motion why even a superficial "consideration" of the Guidelines calculations, as determined by the government and probation in this case, demonstrates that a non-Guidelines sentence is appropriate.

"If the 600-plus pages of the most recent set of sentencing guidelines have taught us anything, it is that punishment cannot be reduced to an algorithm." Hon. Myron H. Thompson, Editorial, Sentencing and Sensibility, N.Y. Times, Jan. 21, 2005. This case is a perfect example. Mr. Thompson is a 36-year-old, non-violent offender – with no prior convictions – yet the offense level calculated by the government "is a level normally only seen in cases involving major international narcotics traffickers, Mafia dons, and the like. How could it possibly apply here?" *Adelson*, 441 F.Supp. 2d at 509. As in *Adelson*, "[w]hat drove the Government's calculation more than any other single factor, was the inordinate emphasis that the Sentencing Guidelines" place on the loss grid in financially-related offenses. *Id*. "As many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors." *Id*.

This one factor has such enormous impact in the Guidelines sentencing calculus, yet it is subject to wildly disparate calculations by the government, probation, and Mr. Thompson. This is just the type of circumstance, identified in *Crosby*, "where either of two Guidelines ranges, whether or not adjacent" is arguably applicable, but this Court, "having complied with section 3553(a), [can] make[] a decision to impose a non-Guidelines sentence, regardless of which of the two ranges applies." Crosby, *supra* at 112; see also *Dhafir*, 577 F.3d 411, 415.

The result is that, despite whatever sentence is derived from an inflexible Guidelines calculus, this Court is free to – and should – substitute a wholly different result via the mandate of section 3553(a).

## VI. Specific Deterrence and Rehabilitation Considerations

A lengthy sentence to incarceration is unnecessary "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). Mr. Thompson is 37 years old. He has no prior criminal convictions. The offense conduct alleged in this case occurred 5-6 years ago, and Mr. Thompson has remained free since that time without posing any danger to the public. He has

complied with all court orders and conditions of release. He has appeared at all necessary court appearances and always behaved appropriately. There is nothing in the record to suggest that Mr. Thompson is ever again likely to break the law. The toll exacted on Mr. Thompson, his wife, his children, and those whom he cares about, by the indictment, trials, and convictions in this case is more than sufficient to meet any specific deterrence concerns.

More importantly, the Court itself recognized that Mr. Thompson does not have a risk of recidivism. Tr. 9/5/17 at 2928, ll. 22-25 ("I will tell you also that I think that of all of the defendants the one who I thought was least likely to recidivate is Mr. Thompson, so my concerns about Mr. Thompson are actually the least.") (Exh. U)

There is no suggestion in the record that Mr. Thompson is in need of incarceration to provide any type of rehabilitation, education, or treatment. Indeed, 18 U.S.C. § 3582(a) specifically provides that, when deciding whether to impose a term of imprisonment, the sentencing judge "shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." (emphasis supplied). For the last four years, Mr. Thompson has been in the process of rehabilitating himself. He has been leading the life of a productive, law-abiding citizen who has been contributing to the good of the community. He has not been involved in any criminal conduct, he has started a business – with an eye towards becoming a charitable "B Corp" (for-profit companies certified by the nonprofit B Lab to meet rigorous standards of social and environmental performance, accountability, and transparency) that contributes to society – and he has been a dedicated father, husband, and partner.

Consequently, any period of incarceration would be greater than necessary to accomplish the sentencing goals of specific deterrence and rehabilitation.

## VII. General Deterrence Considerations

Section 3553(a)(2)(C) states that one purpose of a sentence is "to afford adequate deterrence to criminal conduct." Although general deterrence is an important component of sentencing, the research and literature suggests that – in white-collar cases – the threat of

prosecution and conviction often has sufficient deterrent effect, without an added need for lengthy incarceration. "White-collar and regulatory offenders are more likely to be deterred, even by selective enforcement and modest penalties; such offenders have many lawful alternatives and much to lose from being convicted, regardless of the penalty." Richard Frase, *Punishment Purposes*, 58 STAN. L. REV. 67, 80 (2005). "[T]here is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *Adelson*, 441 F. Supp. 2d at 514. In a recent work on corporate crime, the author reviewed decades of research literature on deterrence and concluded:

> [T]he importance of formal legal sanctions for deterring criminal conduct appears to depend on one's commitment to criminal activities, the influence of other inhibitory mechanisms in one's life (e.g., informal sanctions, educative and habituative influences), the perceived benefits of illegal conduct relative to its costs, and alternative opportunity structures...When sanction threats are taken into account by potential offenders, certainty of punishment tends to matter much more than sanction severity.

Sally Simpson, *Corporate Crime, Law, and Social Control*, p.35 (Cambridge University Press 2002) (emphasis added). "The body of evidence, then, tends to only weakly support a deterrence perspective." *Id*.

"Notwithstanding Congress' impulse to increase sentences for white collar offenses, research indicates that increasing penalties may not increase deterrence and may be unnecessary. A review of several studies indicates that, in general, increasing the duration of a prison sentence for a crime will not result in a decrease in the rate of that crime." Geraldine Szott Moohr, *On the Prospects of Deterring Corporate Crime*, 2 J. BUS. & TECH. L. 25, 33 (2007) (internal footnotes omitted). "[L]engthy prison terms may be unnecessary in the white collar world: if potential wrongdoers recognize a risk of penalties, even relatively short prison sentences are likely to act as a strong deterrent." *Id*. at 34.

For prospective white-collar offenders, the probability of being apprehended and possibly incarcerated may be a more powerful deterrent than the actual length of imprisonment, because the "disutility of being in prison at all may be substantial and the stigma and loss of earning power may depend relatively little on the length of imprisonment." *See* A. Mitchell Polinsky &

Steven Shavell, *On the Disutility and Discounting of Imprisonment and the Theory of Deterrence*, 28 J. LEGAL STUD. 1, 12 (Jan. 1999) (suggesting that "less than-maximal sanctions, combined with relatively high probabilities of apprehension" are "optimal" for deterring white collar crimes); *see also* Joseph F. Savage, Jr. & Abigail K. Hermani, *Reducing White-Collar Sentences Through the Second Chance Act*, BUSINESS CRIMES BULLETIN, Vol. 16, No. 2 (October 2008) ("As a general matter, the shame and reputational damage resulting from conviction are sufficient to deter most white-collar offenders from subsequent criminal behavior.").

Perhaps even more significantly, there is little empirical support for the argument that a lengthy sentence to incarceration results in any greater general deterrence than prosecution and conviction. To the contrary, it seems that increasing punishment levels does not translate to a corresponding increase general deterrence. *See* Gary Kleck, Brion Sever, Spencer Li, and Marc Gertz, *The Missing Link in General Deterrence Research*, 43 Criminology 623, 655 (2005) ("These findings suggest that conventional efforts to increase general deterrent effects beyond their current level are so unpromising that policymakers should consider more productive alternatives . . . . Our findings indicate that no deterrent effect would be lost if punishment levels were reduced from their current levels. . . . "); Richard A. Posner, *An Economic Theory of the Criminal Law*, 85 COLUM. LAW REV. 1193, 1205 n.25 (1985) (noting that large increases in average prison term lengths do not result in equivalent decreases in the crime rate, and that increased prison sentences are not as effective as increasing the probability of apprehension); Paul H. Robinson, *The Utility of Desert*, 91 N.W. U.L. Rev. 453, 462 (1997) (research "surely also suggests that lengthy prison terms are not a particularly useful method of increasing deterrence effects on those who experience them").

Further, some scholars question the fundamental premise that general deterrence is a sound principle for the distribution of punishment:

> There are a number of reasons that one might decide against distributing criminal liability and punishment to optimize deterrence. The most obvious reason comes from [the] conclusion that doctrinal manipulation to optimize deterrence will rarely

> achieve its desired effect. That is, deterrence may be a good reason for having a criminal justice system that punishes violators, but it is at best ineffective as a guide for distributing liability and punishment within that system. Deterrence may be a sound justificatory purpose for the institution of punishment but a poor principle for its distribution.

Paul H. Robinson, *Distributive Principles of Criminal Law: Who Should be Punished and How Much?*, p.87 (Oxford University Press 2008) (emphasis in original). "The general existence of the [punishment] system may well deter prohibited conduct, but the formulation of criminal law rules within the system, according to deterrence-optimizing analysis, may have a limited effect beyond what the system's broad deterrent warning has already achieved." Colin S. Diver, *The Role of Deterrence in the Formulation of Criminal Law Rules: At its Worst When Doing Its Best*, 91 GEORGETOWN LAW. J. 949, 951 (2003). The prosecution and conviction in this case sends a significant message for general deterrence purposes. Under the unusual circumstances of this case – where the last alleged acts occurred over 5-6 years ago, the carriers made more money on the scheme than the alleged co-conspirators, and Mr. Thompson was not actively involved in any auto-subscribing arrangements – the fact that the government pursued a prosecution and obtained a conviction operates as a significant deterrent to other potential offenders. It supports the more significant deterrent factor of "certainty of punishment." There is no empirical support for the argument that a lengthy sentence to incarceration would somehow achieve any greater deterrent effect under these circumstances. As a result, imposition of sentence to incarceration – and especially the lengthy incarceration that the government seeks – would be greater than necessary to serve the purposes of sentencing in this respect.

**VIII. Section 3553(A)(6)—The Need to Avoid Unwarranted Sentence Disparities**

One of the sentencing considerations under section 3553(a)(6) is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

Three defendants, Michael Pearse, Yongchao Liu, and Eugeni Tsvetnenko are fugitives.

Only one other defendant has been sentenced in this case, Francis Assifuah. He was sentenced to 33 months imprisonment, two years' supervised release, $819,590 in restitution, and

a $600,000 forfeiture order. (PSR, ¶ 15) Like Mr. Assifuah, Mr. Thompson was not an originator and was recruited into the activities by other, higher-ranking figures. While Mr. Thompson recognizes that he was involved for a longer period of time and received a commensurately greater financial benefit, he submits that from a criminality perspective he was less involved; Mr. Assifuah created a computer platform to run auto subscription, corresponded about wiping and deleting servers, and worked to improve the system to make it undetectable. The reason that his level of monetary involvement is lower was that other of the defendants deemed his platform too unsophisticated and risky.

Indeed this Court has noted that of all the defendants in this case, Mr. Thompson is the least culpable. Tr. 9/5/17 at 2929, ll. 4-7 (Exh. U) ("But if I were to rank people in terms of their levels of culpability, he would be at the very bottom of all of these defendants, including Mr. Jason Lee, and including Mr. Goff, and far below Mr. Wedd.")

**IX. Section 3553(A)(7)—Need to Provide Restitution**

With regard to the restitution that may be ordered against Mr. Thompson, he reiterates that not all proceeds involved were from illegal auto-subscribing. Furthermore, as to the monies that did derive from auto-subscribing, Mr. Thompson respectfully notes that affected customers have been receiving, or will receive, restitution as a result of the civil litigation with the Federal Trade Commission that preceded and led to the criminal prosecution. As part of settlements with the FTC and FCC, all of the major mobile phone carriers notified customers affected by SMS auto-subscribing of their eligibility for refunds. Verizon agreed to pay $70 million, Sprint $50 million, AT&T $80 million, and T-Mobile up to $67.5 million for consumer refunds (T-Mobile actually paid $20 million in refunds and reserved up to $90 million for additional customer refunds). (See Exhs. O to S) Collectively, the carriers have agreed to pay more than $267.5 million in restitution to customers. And even prior to the settlements, the carriers had already instituted liberal refund policies that they said resulted in tens of millions refunded to customers.

Mr. Thompson therefore respectfully asks that whatever restitution is awarded—which he readily admits is likely to be substantial—amounts representing lawful proceeds or restitution

already paid by mobile phone carriers be deducted. This is necessary to comport with basic principles of due process and against double recovery.

**X. Conclusion**

The ultimate goal of any sentencing is to provide a sentence "sufficient, but not greater than necessary" to accomplish the goals of sentencing. The Guidelines are just one factor in that determination—and here a factor that deserves little weight, where as justifiably recognized in the PSR, the other sentencing factors set forth in § 3553(a) all militate in favor of a significantly more lenient sentence. Consequently, although the sentence recommended in the PSR is more reasonable than that sought by the government, Mr. Thompson respectfully requests that this Court impose a sentence of incarceration not to exceed 36 months.

Dated: Los Angeles, California
January 5, 2018

Respectfully submitted,

BROWNE GEORGE ROSS LLP

By: */s/ Marc S. Nurik*

Marc S. Nurik
mnurik@bgrfirm.com

2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone: (310) 274-7100

*Attorney for Defendant Fraser Thompson*