**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 8, 2018

**BY ECF**
The Honorable Katherine B. Forrest
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    **United States** v. **Fraser Thompson**
               S3 15 Cr. 616 (KBF)

Dear Judge Forrest:

      The Government respectfully submits this letter in advance of the sentencing of defendant Fraser Thompson and in response to the defendant's sentencing memorandum, dated January 5, 2018 ("Def. Mem."). As set forth in the Presentence Investigation Report ("PSR"), the Guidelines range is 168 to 210 months' imprisonment, to be followed by a mandatory and consecutive 24 months' imprisonment. (PSR ¶ 140). The Probation Office recommends a below-Guidelines sentence of 144 months' imprisonment, while the defendant requests a sentence of 36 months' imprisonment. (PSR at 33; Def. Mem. at 1). For the reasons set forth below, the Government respectfully submits that a substantial sentence of incarceration would be fair and appropriate in this case.

**A.**    **Background**

      **1.**    **The Offense Conduct**

      From 2011 through 2013, the defendant and others engaged in a massive scheme to defraud ordinary consumers by placing unauthorized charges for premium text messaging services on their cell phone bills through a practice known as auto-subscribing. (PSR ¶ 22). The scheme essentially involved two main players in the cell phone industry: aggregators and content providers. (PSR ¶¶ 24-25). Mobile Messenger, the defendant's employer, was the aggregator that played a central role in the scheme. (*See* PSR ¶ 31). It provided many of the phone numbers of the consumers who would be auto-subscribed and the mechanism that permitted the charges for those unwanted services to appear on the consumers' cell phone bills. (*See, e.g.,* PSR ¶¶ 25, 37, 40, 42, 50). The content providers sent consumers the unwanted text messages that ultimately resulted in them being billed for services they had not authorized. (PSR ¶¶ 24-25). These messages consisted of a pin message, a welcome message, and content messages.

      In the auto-subscribing scheme, Mobile Messenger worked with three sets of content providers, all of which were essential to the scheme's success: (1) Tatto Media, which was

operated by Lin Miao; (2) CF Enterprises and DigiMobi, which were operated by Eugeni Tsvetnenko, a/k/a "Zhenya," and (3) Bleam Technology, which was operated by Francis Assifuah. (PSR ¶¶ 33-35). The defendant was charged and convicted for his role in auto-subscribing with Zhenya, through the content providers CF Enterprises and DigiMobi.

The plan to auto-subscribe with Zhenya came about in early 2012, in connection with discussions between Darcy Wedd, Erdolo Eromo, Michael Pajaczkowki, a/k/a "Paj," and the defendant about how to increase revenue at Mobile Messenger, in the wake of the decreasing profitability of premium text messaging services. (PSR ¶ 48). By this time, Wedd and Paj had already been auto-subscribing with Miao through Tatto Media, and Eromo and Paj were planning to auto-subscribe with Assifuah through Bleam Technology. (*See* PSR ¶¶ 39-40, 60). Zhenya operated several content provider companies and other mobile industry companies based in Australia. (PSR ¶ 48). Zhenya had been kicked off Mobile Messenger's aggregation platform in the past due to suspicious subscribing practices, including past incidents of auto-subscribing. (*See id.*). Although Thompson did not participate in the initial discussions between Wedd, Eromo, and Paj about auto-subscribing with Zhenya, he quickly became a part of the scheme, and joined ongoing discussions about it. (*See id.*). The discussions resulted in Zhenya establishing two new content providers, CF Enterprises and DigiMobi, to conduct the scheme on Mobile Messenger's aggregation platform. (PSR ¶ 49). Wedd, Eromo, Paj, and the defendant agreed to a revenue split with Zhenya, pursuant to which Zhenya would keep approximately 70% of the auto-subscribing proceeds generated by CF Enterprises and DigiMobi, and the remaining 30% of the auto-subscribing proceeds would be divided evenly between Wedd, Eromo, Paj, and the defendant. (*Id.*).

Wedd, Eromo, Paj, and the defendant each played important roles in the scheme to auto-subscribe with Zhenya. The defendant and Eromo worked on the short code strategy for the scheme, to ensure that Zhenya was supplied with all the short codes he needed to be able to send the consumers the unwanted text messages. (PSR ¶ 50). Paj furnished lists of phone numbers to Zhenya, along with an auto-subscribing "playbook," which provided Zhenya with guidance on how to auto-subscribe without being caught. (*Id.*). Wedd, to whom Eromo, Paj, and the defendant all reported, oversaw the scheme. (*Id.*). The defendant also had explicit conversations with the others about ways in which they could carry out the scheme without being detected. For instance, the defendant suggested to Paj that, in order to avoid leaving a digital trail, Paj should create an alias email account that both he and Zhenya could access, and then use that account to write each other emails in draft form. (*Id.*).

Wedd, Eromo, Paj, and the defendant devised a method of receiving and distributing the auto-subscribing money from Zhenya in a manner that would conceal the nature and purpose of the money. (PSR ¶ 53). Through the method they devised, Zhenya kicked back 30% of his auto-subscribing proceeds to a nominee company controlled by Eromo. (*Id.*). From there, Eromo distributed the 30% cut evenly amongst himself, Wedd, Paj, and the defendant. (*Id.*). At the defendant's request, Eromo distributed the defendant's share of the 30% to him by sending it to a nominee company, Ocean Tactics LLC, that the defendant controlled. (PSR ¶¶ 53, 57). The defendant created Ocean Tactics on or about February 14, 2012, for the purpose of receiving money from the Zhenya auto-subscribing scheme, as well as money from a separate content provider scheme that the defendant, Wedd, Paj, and Eromo were conducting behind Mobile Messenger's back. (PSR ¶ 57). Eromo, at the defendant's instruction, also passed the defendant's

share of auto-subscribing money through another company, Erdi Development, before sending it on to Ocean Tactics, so that the defendant would have another layer of separation disguising his receipt of the fraud proceeds. The defendant sent Eromo monthly invoices reflecting the money that the defendant was owed for both the Zhenya auto-subscribing scheme and the separate content provider scheme. (*Id.*). On these invoices, the defendant falsely described the money as being due to him in payment for "consulting professional services," even though, in fact, the defendant had not performed any such services. (*Id.*). The phrase "consulting professional services" was commonly used by the defendant and various co-conspirators to conceal the fact that they were being paid for their assistance in auto-subscribing. (*Id.*).[1]

Zhenya, with the assistance of Wedd, Eromo, Paj, and the defendant, started auto-subscribing consumers in approximately April of 2012. (PSR ¶ 51). Zhenya's auto-subscribing activities, which continued into 2013, resulted in hundreds of thousands of mobile phone numbers being auto-subscribed through Mobile Messenger. (*Id.*). In August of 2012, Zhenya inadvertently auto-subscribed Marc Ouellette, a Mobile Messenger employee who was unaware of the auto-subscribing scheme. (PSR ¶ 52). Ouellette subsequently emailed the defendant about the fact that Ouellette had been auto-subscribed by Zhenya. (*Id.*). The defendant then had a nervous discussion about the incident with Eromo, during which the defendant worried that the inadvertent auto-subscription of Ouellette would cause their fraudulent scheme to be uncovered. Nevertheless, thereafter, the defendant continued to participate in the auto-subscribing scheme, and to receive revenues from the scheme. (*Id.*).

In total, as a result of the Zhenya auto-subscribing scheme, consumers were defrauded out of approximately $41,389,725. (PSR ¶ 70). After the phone companies and Mobile Messenger took their portions of that money, which amounted to approximately 35% for the phone companies and 15% for Mobile Messenger, respectively, Zhenya received the remaining 50%, which amounted to approximately $20,694,860.80. (*See id.*). From there, Zhenya distributed 30% of the $20,694,860.80 to Wedd, Eromo, Paj, and the defendant, to be split evenly amongst the four of them. In total, then, the defendant personally received approximately $1,552,114.56 in auto-subscribing proceeds (which is 30% of $20,694,860.80, divided by four). The defendant's company, Ocean Tactics, received approximately $9,892,120.65 in proceeds, which was a combination of the $1,552,114.56 in auto-subscribing money, and money due to the defendant for his participation in the separate content provider scheme. (*See id.*).

### 2. The Charges, the Verdict, and the Guidelines Calculation

On June 5, 2017, the defendant was charged in Counts Five through Eight of the above-referenced superseding Indictment, with: (1) participating in a conspiracy to commit wire fraud, by auto-subscribing consumers through CF Enterprises and DigiMobi (the "Zhenya auto-subscribing scheme"); (2) wire fraud in connection with the Zhenya auto-subscribing scheme; (3) using the telephone numbers of consumers without authorization, as part of the Zhenya auto-

---

[1] The trial evidence indicated other steps the defendant used to cover his tracks, including by suggesting that Paj use draft emails to provide data to Zhenya (*see* Trial Transcript ("Tr.") at 509-10), speaking with Eromo about destroying Eromo's laptop that contained incriminating information (*see* Tr. at 599-600), and discussing the use of an email account that the defendant could use to communicate in secret with Wedd and Eromo (*see* Tr. 1525-26).

subscribing scheme: and (4) participating in a conspiracy to launder the money received from the Zhenya auto-subscribing scheme. (PSR ¶¶ 6-9). On September 5, 2017, a jury found the defendant guilty as charged.

The PSR correctly calculates the appropriate Guidelines Range under the United States Sentencing Guidelines. As calculated therein, the base offense level is 7, and the following enhancements are warranted: (1) a 22-level enhancement for a loss amount of between $25,000,000 and $65,000,000, (2) a 2-level enhancement because the offense involved ten or more victims, (3) a 2-level enhancement because the offense involved sophisticated means, and (4) a 2-level enhancement because the defendant was convicted under Title 18, United States Code, Section 1956. (PSR ¶¶ 80-84). This leads to a total offense level of 35. (PSR ¶ 88). The defendant has no known prior criminal history, which places him in Criminal History Category I. (PSR ¶ 94). Accordingly, the defendant's Guidelines Range is 168 to 210 months' imprisonment, to be followed by a mandatory and consecutive 24 months' imprisonment (as a result of the conviction on Count Seven, the aggravated identity theft charge). (PSR ¶ 140). The defendant should also be ordered to forfeit the auto-subscribing proceeds that he personally received from the scheme, which, as discussed above, amounted to approximately $1,552,114.56. Finally, the defendant is responsible for restitution, which should be paid jointly and severally with his co-defendants in the Zhenya auto-subscribing scheme. As noted above, the total loss suffered by the victims of the scheme was approximately $41,389,725.

**B.     Discussion**

### 1.      Applicable Law

The Guidelines are no longer mandatory, but they still provide important guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007). The Guidelines range is thus "the lodestar" that "'anchor[s]'" the district court's discretion. *Molina-Martinez* v. *United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh* v. *United States*, 133 S. Ct. 2072, 2087 (2013)).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing outlined in 18 U.S.C. § 3553(a)(2). To the extent a district court imposes a sentence outside the range recommended by the Guidelines, it must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *United States* v. *Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting *Gall*, 552 U.S. at 50).

### 2.      A Substantial Sentence of Incarceration Would Be Just and Appropriate

In the Government's view, a substantial sentence of incarceration would be fair and appropriate in this case. In particular, the nature and circumstances of the offense, the need for just punishment, the history and characteristics of the defendant, the need to promote respect for the law, and the need for both specific and general deterrence all justify such a sentence.

**Nature and Circumstances of the Offenses and the Defendant's Role**

The nature and circumstances of the offense are very serious. The defendant and his co-conspirators used stolen lists of hundreds of thousands of phone numbers to bill people without their authorization for services they did not want. The defendant and his co-conspirators participated in this fraud with the knowledge that it was designed to avoid detection by billing large numbers of people in small amounts that they were unlikely to complain about. This type of high-volume, low-dollar amount fraud is particularly dangerous to society because of the inherent difficulty in detecting and stopping it. The defendant and others like him need to be deterred from engaging in this type of fraud in the future, especially because they are unlikely to believe they will be caught. The defendant, moreover, was not a minor participant in the fraud. Rather, he was an equal player – along with Wedd, Eromo, and Paj – in carrying out the tasks that were necessary to make auto-subscribing with Zhenya a success, and in strategizing with the others about how to carry out the scheme in a manner that would be likely to evade detection. The defendant's role as an equal player in the fraud is also reflected by the fact that the defendant, Wedd, Eromo, and Paj divided the fraud proceeds that they received equally amongst one another.

With respect to his role in the conspiracy, the defendant contends at various points that he had a "comparatively minor" role, (Def. Mem. at 11); and possessed "a diminished intent relative to his co-conspirators" (*Id*.). Neither of these assertions is correct. The defendant entered the Zhenya auto-subscribing scheme with full knowledge of the consequences of such a fraud. [2] He asked to join; he was not dragooned or coerced to join. (*See* Tr. at 1312-13 (Eromo testimony that at a meeting at Starbucks in early 2012, Thompson "told me that Darcy had informed him of the meeting that we had, and he wants to meet up to discuss the opportunities that we talked about . . . . He was curious, he was interested, and he wanted to find out more, and find out how we could all work together").). He was not a passive recipient of fraudulent proceeds, as the defense contends, but was an active strategist and perpetrator of this fraud. (*See* Tr. at 506 (the defendant and Eromo were responsible for "obtaining and planning short codes for this scheme"); 1315 (the defendant and Eromo discussed "short code strategy . . . for CF Enterprise [sic] in depth so that we could implement the strategy fairly quickly and start the auto-subscription fairly quickly"); 1317 (Thompson was responsible for "getting the short codes provisionally certified through the pipeline fairly quickly [f]or the short codes we were helping Zhenya buy on the aggregation platform").).

At bottom, defense counsel confuses what he contends was a "diminished intent" with the facts established at trial—that the defendant was cautious and careful in his communications and was concerned with getting caught. For example, as the Zhenya auto-subscribing scheme was

---

[2] It bears noting as well that the defendant engaged in other improper conduct at Mobile Messenger, including receiving bribes in exchange for giving preferential treatment to content providers. (*See, e.g.*, Tr. at 1288-89 (Eromo testimony regarding splitting $20,000 in cash from Tatto with the defendant, in exchange for moving short codes, in early 2012); *Id*. at 1291-92 (Eromo testimony regarding discussing sharing $200,000 from Tatto with Thompson in exchange for saving short codes, in March 2012, and the steps Thompson took, including "spend[ing] hours . . . trying to figure out the complicated entity structure of Tatto Media . . . [and] get[ting] constant updates from people that are involved to see, you know, what could be done and when and how").).

about to launch, the defendant "was concerned that he did not want the auto-subscription scheme to be discovered, and then for that to bring us [Thompson, Wedd, Paj, and Eromo] down as it related to the entire content provider scheme]." (Tr. at 509).  The defendant, however, acknowledged at the inception of the conspiracy that "auto-subscription was basically stealing." (*Id.*).  The trial proof established that it was the concern that he would get caught for clearly illegal activity, and not any sort of "diminished intent," that led to the defendant trying to minimize the paper trail that pointed to his involvement in the scheme.

The defendant also seeks to minimize his responsibility by arguing that "there has been no showing that all of those funds [billings related to Zhenya's content providers CF Enterprises and DigiMobi] arose from the activities giving rise to the conviction." (Def. Mem. at 9).  However, the testimony at trial was clear and unequivocal—those content providers were set up by Zhenya, with assistance from the defendant, Wedd, Paj, and Eromo, in order to defraud consumers through auto-subscribing.  (*See, e.g.*, Tr. at 501 (Paj testifying that he "got with Erdolo the following day or so, and we started figuring out all the new content providers and short codes that we would need to get and have set up so that he could conduct his auto-subscription scheme"); 1314 (Eromo testimony that CF Enterprises was "the company that Zhenya Tsvetnenko set up for the purposes of auto-subscribing with myself, Darcy Wedd, Fraser Thompson, and Michael Paj," and the DigiMobi was another such company); 1941 (Eromo testimony that CF Enterprises money came from auto-subscribing); 1421-22 (Eromo testimony that DigiMobi money came from auto-subscribing.).  The trial proof established that the defendant and Eromo discussed the formation of CF Enterprises and the very start of this scheme.  (*See, e.g.*, GX 857 (Eromo reminder, dated February 13, 2012, to discuss CF Enterprises with the defendant).).  Moreover, the defendant understood Zhenya's history as a bad actor in the industry, he understood that Zhenya had been caught auto-subscribing on previous occasions, and he knew that Zhenya's new entities CF Enterprises and DigiMobi quickly became some of the largest revenue-generating content providers on Mobile Messenger's aggregation platform.  In light of these facts, there can be no serious argument that all of the business generated by CF Enterprises and DigiMobi at Mobile Messenger stemmed from auto-subscribing fraud.

The defendant further seeks to minimize the level of his culpability by contending that "[t]he picture that the jury had before it, which it obviously relied upon in reaching its guilty verdict, was one of a person whose intent was based on conscious avoidance." (Def. Mem. at 9).  This, again, is incorrect.  As set forth above, the defendant had *actual* knowledge that he was participating in an auto-subscribing conspiracy.  He asked to join the conspiracy, presumably as a way to make some extra money for himself.  He participated in meetings and phone calls where he and others discussed the means and methods of the conspiracy.  He routed the dirty money through layers of bank accounts.  To suggest that he is guilty, at most, of sticking his head in the sand with respect to what his co-conspirators were doing is to ignore the evidence at trial.

**History and Characteristics of the Defendant**

The history and characteristics of the defendant also justify a significant sentence.  As the Probation Office points out, the defendant has not expressed any remorse for his conduct or exhibited any acceptance of responsibility.  (*See* PSR at 33).  But as a unanimous jury found, the defendant was an active participant in this scheme, who knew full well that he was ripping off consumers and who repeatedly tried to cover it up.  Moreover, the defendant profited substantially

from his participation in the fraud, to the tune of over $1.5 million. Yet, since the fraud's completion, the defendant has engaged in questionable financial activities, including placing his residence in a trust in November of 2014 and paying monthly "rent" to the trust. (*See id.*). Certainly, the fact that the defendant has no known criminal history, and is the father to two young children, must also be considered in fashioning an appropriate sentence. The letters submitted by the defendant discuss those personal considerations. However, the defendant well understood his family obligations when he decided to participate in his conspiracy. Despite having a strong support network— a supportive family, a high paying job, and considerable financial resources at his disposal—the defendant chose to engage in a massive fraud and to steal from others in order to enrich himself and his family.

**Comparison to Co-Defendants**

To date, the Court has sentenced one defendant for his participation in the instant conspiracy. Francis Assifuah, who operated a content provider that engaged in "active" auto-subscribing (*i.e.*, using telephone numbers initially to enroll cellphone users in a Premium SMS service) for one month, was sentenced to a term of imprisonment of 33 months, the bottom end of the Guidelines that were applicable to him. Assifuah was sentenced after conviction for wire fraud conspiracy; there was not a mandatory consecutive 24 months of imprisonment for Assifuah as there is for the defendant, who was also convicted of aggravated identity theft. Moreover, the defendant's involvement in the conspiracy was much more substantial than Assifuah's involvement, and while the defendant contends that he is the least culpable of all defendants, (Def. Mem. at 18), the Government respectfully submits that is incorrect. The defendant (a) asked his way into this conspiracy; (b) used his trusted position at Mobile Messenger to help launch CF Enterprises and DigiMobi into auto-subscribing; (c) held numerous meetings with co-conspirators to discuss how to cover their tracks and avoid detection; (d) used a shell company to receive and disguise auto-subscribing proceeds; (e) insisted that Eromo insert an additional layer of bank account protection to help avoid detection; (f) profited the same as his Mobile Messenger co-conspirators from the Zhenya auto-subscribing scheme; and (g) helped perpetrate the scheme for approximately two years.[3]

In light of the nature and seriousness of the offense, the defendant's continued lack of remorse and refusal to accept responsibility for his actions, and the needlessness of the defendant's decision to engage in this conduct, a substantial sentence of incarceration would be sufficient but not greater than necessary to satisfy the goals of sentencing.

---

[3] The defendant's conviction for aggravated identity theft, in violation of 18 U.S.C. § 1028A, carries with it a mandatory consecutive term of imprisonment of 24 months. In light of that statutory requirement, the defendant's request for a 36-month term of imprisonment translates to 12 months for his participation in massive wire fraud and money laundering conspiracy, less than ten percent of the bottom end of the applicable Guidelines range. The Government respectfully submits that such a sentence reflects neither the nature and circumstances of the offense nor the defendant's role, and does not promote respect for the law. *See* 18 U.S.C. § 3553(a)(1)-(2).

**Conclusion**

For the reasons set forth above, a substantial sentence of incarceration would be fair and appropriate in this case.

                                        Respectfully submitted,

                                        GEOFFREY S. BERMAN
                                        United States Attorney

By:     /s/
                                        Sarah E. Paul
                                        Richard Cooper
                                        Jennifer L. Beidel
                                        Assistant United States Attorneys
                                        (212) 637-2326/1027/2212

cc:     Marc S. Nurik, Esq.